IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


MERRICK BARRINGTON STEDMAN,   *

     Petitioner,   *

v.   *     Civil Action No. GLR-15-230

DAYENA CORCORAN, et al.,   *

     Respondents.   *

\*\*\*\*\*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Petitioner Merrick Barrington Stedman's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 1). Stedman, an inmate confined at the North Branch Correctional Institution in Cumberland, Maryland, seeks to attack his 1993 convictions for murder and a handgun offense arising from the shooting of Sean Bristol. The Petition is ripe for disposition, and no hearing is necessary. See Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts; see also 28 U.S.C. § 2254(e)(2) (2018). For reasons set forth herein, the Court will dismiss the Petition.

## I.     BACKGROUND

### A.    **State Court Proceedings**

On August 10, 1992, Bristol was shot eight times in the 2900 block of Nicholson Street, Hyattsville, Maryland. (Pet. Writ Habeas Corpus ["Pet."] Ex. 6, ECF No. 1-1 at

22).[1] On December 13, 1992, the State filed a two-count indictment against Stedman in the Circuit Court for Prince George's County, Maryland. (Pet. at 1, ECF No. 1). On June 9, 1993, a jury convicted Stedman on both counts: first-degree murder and the use of a handgun in the commission of a felony. (Resp'ts' Ltd. Ans. Pet. ["Ans."] Ex. 1 at 6, ECF No. 6-1; Pet. at 1). Stedman was sentenced to life plus twenty years on July 6, 1993. (Ans. Ex. 1 at 7; Pet. at 1). Stedman noted a timely appeal, and on April 22, 1994, the Court of Special Appeals of Maryland affirmed Stedman's convictions. (Ans. Ex. 2 at 20, ECF 6-2). Stedman filed a petition for writ of certiorari to the Court of Appeals of Maryland, which the court denied on September 28, 1994. See Stedman v. State, 647 A.2d 1216 (Md. 1994) (table).

On June 9, 1999, Stedman filed a petition for post-conviction relief in the Circuit Court for Prince George's County. (Ans. Ex. 1 at 9). On May 14, 2001, the Circuit Court denied Stedman's petition. (Id. at 12). After reopening Stedman's post-conviction proceedings, the Circuit Court again denied Stedman's petition on April 5, 2002. (Id. at 14). On October 1, 2002, the Court of Special Appeals denied Stedman's application for leave to appeal the denial of post-conviction relief. (Id. at 15). The court's mandate issued on November 4, 2002. (Id.).

Stedman then moved to reopen his post-conviction proceedings. (Id. at 15–16). On September 26, 2003, the Circuit Court denied Stedman's motion. (Id. at 16). On March 19,

---

[1] Citations to Exhibits to Stedman's Petition refer to the pagination the Court's Case Management and Electronic Case Files ("CM/ECF") system assigned.

2004, the Court of Special Appeals denied Stedman's application for leave to appeal. (Id.). The court's mandate issued on April 19, 2004. (Id.).

On June 10, 2008, Stedman again moved to reopen his post-conviction proceedings, this time based on affidavits from two witnesses to Bristol's murder, Ralph Vogelson and Reginald Baker, who averred that Stedman was not the shooter. (Id. at 17; Ans. Ex. 3 at 4–5, ECF No. 6-3; see also Vogelson Aff., ECF No. 1-1 at 2–3; Baker Aff. ECF No. 1-1 at 5–6).[2] The Circuit Court denied the motion on October 21, 2008. (Ans. Ex. 1 at 17). The Court of Special Appeals denied Stedman's application for leave to appeal on July 7, 2010, with the court's mandate issuing on August 6, 2010. (Id. at 18).

On January 18, 2011, Stedman filed a petition for writ of actual innocence in the Circuit Court. (Id.). The Circuit Court denied the petition on February 21, 2012. (Id. at 19). The Court of Special Appeals affirmed the Circuit Court's decision on March 14, 2014. (Ans. Ex. 3 at 1, 15). The Court of Appeals denied Stedman's petition for writ of certiorari on July 21, 2014. Stedman v. State, 96 A.3d 146 (Md. 2014) (table).

B.    **Proceedings in this Court**

On January 26, 2015, Stedman filed his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (the "Petition"). (ECF No. 1). On February 9, 2015, the Court entered

_____

[2] The Court notes that the Vogelson affidavit and the Baker affidavit are signed but they are not dated. (See Vogelson Aff., ECF No. 1-1 at 2–3; Baker Aff. ECF No. 1-1 at 5–6). The Vogelson affidavit is notarized and dated October 27, 2010. (Vogelson Aff., ECF No. 1-1 at 2–3). Stedman asserts that he received both affidavits in 2005, (Pet. at 4), and moved to reopen his state-postconviction proceedings in 2008 based on in part on Vogelson's affidavit. Thus, the significance, if any, of the October 2010 notarization of the Vogelson affidavit is unclear.

an Order directing Respondents to file an Answer to the Petition. (Feb. 10, 2015 ¶ 1, ECF No. 2). Respondents filed their Limited Answer to Petition for Writ of Habeas Corpus and Order to Show Cause (the "Limited Answer") on April 23, 2015, arguing that the petition is time-barred and that it should be dismissed on that basis. (ECF No. 6).

On April 30, 2015, the Court entered an Order granting Stedman twenty-eight days to file a Response addressing the timeliness issue. (Apr. 30, 2015 Order at 2, ECF No. 7). The Court granted Stedman an extension of time to respond, (ECF No. 9), and on June 19, 2015, Stedman filed his Response, (ECF No. 10). In his Response, Stedman asserts that he is pursuing an actual innocence claim, which permits the Court to consider a petition that may otherwise be time-barred.

On November 13, 2017, the Court directed Respondents to file a supplemental response to the petition addressing Stedman's actual innocence claim and to supplement the record with copies of the trial transcripts, post-conviction petitions, and post-conviction transcripts. (Nov. 13, 2017 Order at 4, ECF No. 14). Respondents filed a Supplemental Answer to Petition for Writ of Habeas Corpus and Order to Show Cause (the "Supplemental Answer") on April 2, 2018. (ECF No. 25). Respondents also filed several supplements to the record. (See ECF Nos. 18, 20, 22, 24, 25). On April 30, 2018, Stedman filed a Response to the Supplemental Answer. (ECF No. 28).

## II.    DISCUSSION

### A.    <u>Timeliness</u>

Respondents contend that Stedman's Petition is time-barred. Under the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), a one-year statute of

limitations applies to habeas petitions in non-capital cases for persons convicted in state court. See 28 U.S.C. § 2244(d)(1) (2018). The AEDPA provides, in pertinent part, that:

> A [one]-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> *****
>
> (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

### 1.   Statutory Tolling

Under § 2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

Stedman's convictions became final in 1994 before the AEDPA was signed into law on April 24, 1996. Antiterrorism and Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). Among the changes the AEDPA made to the law governing state habeas petitions was the addition of a one-year statute of limitations in non-capital cases for persons convicted in state court as detailed above. Although the AEDPA is silent as to how this provision applies to persons whose convictions were final before the date of its

enactment, the United States Court of Appeals for the Fourth Circuit has clarified that such persons had one year from the effective date, i.e., until April 24, 1997, to file a petition for writ of habeas corpus in federal court. Hernandez v. Caldwell, 225 F.3d 435, 439 (4th Cir. 2000). Like petitions filed after the AEDPA's effective date, this one-year period is tolled while properly filed post-conviction proceedings are pending. Hernandez, 225 F.3d at 439 (4th Cir. 2000); Harris v. Hutchinson, 209 F.3d 325, 328 (4th Cir. 2000); see also 28 U.S.C. § 2244(d)(2).

Here, from the enactment of the AEDPA on April 24, 1996 to the filing of his application for post-conviction relief on June 9, 1999, Stedman had no post-conviction proceedings pending in state court that would have served to toll the limitations period. Thus, the federal limitations period for filing the instant Petition expired years before Stedman began to pursue his state court post-conviction remedies. The Court, therefore, concludes that the Petition is untimely under § 2244(d)(1)(A).

To the extent Stedman asserts that his Petition falls under 28 U.S.C. § 2244(d)(1)(D) based on the affidavits from Baker and Vogelson, his Petition is still untimely. Stedman procured the Baker and Vogelson affidavits in 2005. Stedman did not move to reopen state post-conviction proceedings until June 2008, and he did not file the instant Petition until 2015. Stedman had no proceedings pending that would have tolled the limitations period from the discovery of the Baker and Vogelson affidavits in 2005 to the filing of his motion to reopen post-conviction proceedings in 2008. In addition, Stedman does not explain the nearly three-year delay in presenting the evidence to a state court, nor does he explain the

ten-year delay in presenting the evidence to this Court. Thus, the Court concludes that Stedman's Petition is untimely under § 2244(d)(1)(D).

## 2. Equitable Tolling

The limitation period may also be subject to equitable tolling in appropriate cases. Holland v. Florida, 560 U.S. 631, 645 (2010); Harris, 209 F.3d at 329–30. To be entitled to equitable tolling, a habeas petitioner must show: (1) "that he has been pursuing his rights diligently"; and (2) "that some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649 (internal quotation marks omitted) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). The Fourth Circuit requires that a petitioner asserting equitable tolling must show that the extraordinary circumstances were "beyond his control or external to his own conduct." Rouse v. Lee, 339 F.3d 238, 246 (4th Cir. 2003) (en banc); Whiteside v. United States, 775 F.3d 180, 185 (4th Cir. 2014) (en banc); Harris, 209 F.3d at 330. Further, equitable tolling of the strict application of the one-year statute of limitations "must be guarded and infrequent." Harris, 209 F.3d at 330. It is reserved for "those rare instances where—due to circumstances external to the party's own conduct— it would be unconscionable to enforce the limitation period against the party and gross injustice would result." Id.

Stedman does not offer any specific arguments in favor of equitable tolling. The Court will nevertheless address the issue because if Stedman is entitled to equitable tolling, then the Court need not reach his actual innocence claim.

Here, Stedman's conviction became final in 1994, and his window for filing a federal habeas petition regarding his case closed in April 1997. He did not file this Petition

until 2015—almost eighteen years later. Moreover, Stedman has offered no explanation for the three-year delay between his receipt of the Vogelson and Baker affidavits and the filing of his motion to reopen state post-conviction proceedings, nor has he explained the nearly ten-year delay between his receipt of the affidavits and his filing the instant Petition. Such delays disqualify a petitioner from receiving the benefit of equitable tolling. See McQuiggin v. Perkins, 569 U.S. 383, 391 (2013) (holding that a nearly six-year delay in seeking federal habeas relief after receiving witness affidavits prevented petitioner from establishing the required diligence for equitable tolling). The Court, therefore, concludes that Stedman is not entitled to equitable tolling.

In sum, Stedman is not entitled to statutory or equitable tolling. As a result, Stedman's Petition is time-barred. The Court next considers Stedman's assertions of actual innocence, an exception to the AEDPA's limitations provisions.

**B.**     **Actual Innocence Claim**

Stedman asks that the Court consider his habeas claims, notwithstanding their untimeliness, because he has demonstrated actual innocence, a gateway through which the Court may consider untimely habeas petitions.[3] Respondents contend that Stedman has

---

[3] As to the Petition's constitutional claims, Stedman asserts: (1) he was denied effective assistance of counsel because his trial attorney failed to object to the reasonable doubt jury instruction; and (2) Brady v. Maryland, 373 U.S. 83 (1963), violations arising from: (a) the prosecutor failing to disclose to Stedman's trial attorney an August 10, 1992 signed, written statement from Vogelson that was consistent with the affidavit Stedman obtained from Vogelson in 2005; and (b) the prosecutor failing to provide Stedman's trial attorney Baker's name and address despite a request for discoverable evidence.

failed to make the requisite showing of actual innocence. At bottom, the Court agrees with Respondents and will dismiss the Petition.

The "miscarriage of justice" or "actual innocence" exception to the AEDPA's limitations provisions creates a procedural mechanism through which a petitioner may pursue his claims that are otherwise time-barred. Perkins, 569 U.S. at 399; see also Teleguz v. Pearson, 689 F.3d 322, 327 (4th Cir. 2012) (observing that an actual innocence claim is a "procedural mechanism rather than a substantive claim"). The actual innocence exception "is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." Perkins, 569 U.S. at 392 (internal quotation marks omitted) (quoting Herrera v. Collins, 506 U.S. 390, 404 (1993)). That said, claims of actual innocence presented as gateways to excuse a procedural default "should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998)

To establish an actual innocence claim, a petitioner must first "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Finch v. McKoy, 914 F.3d 292, 298 (4th Cir. 2019) (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)). The petitioner must then establish that "the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt." Id. (quoting Teleguz, 689 F.3d at 329). Put differently, a petitioner does not satisfy the actual innocence exception unless he "persuades the district court that, in light of the new evidence, no juror acting reasonably would have voted to find him guilty beyond a reasonable doubt." Perkins, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329).

If the evidence is both reliable and new, the reviewing court then considers "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 538 (2006) (internal quotation marks omitted); see also Wilson, 155 F.3d at 404–05 ("A reviewing court must evaluate the new evidence alongside any other admissible evidence of the defendant's guilt . . . ."). This requires a "holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." Finch, 914 F.3d 292 at 299 (quoting House, 547 U.S. at 539). Further, the actual innocence standard "does not require absolute certainty about the petitioner's guilt or innocence." House, 547 U.S. at 538.

In reviewing the total evidentiary record, the Court must "make a probabilistic determination about what reasonable, properly instructed jurors would do." Id. (quoting Schlup, 513 U.S. at 329). The Court does not, however, "make an independent factual determination about what likely occurred," but rather "assess[es] the likely impact of the evidence on reasonable jurors." Id.

Courts have found that a petitioner made a credible actual innocence claim where the petitioner provided: (1) new DNA evidence and expert testimony "call[ing] into question" the "central forensic proof connecting [the petitioner] to the crime," as well as "substantial evidence pointing to a different suspect," House, 547 U.S. at 544; (2) "sworn statements of several eyewitnesses that [the petitioner inmate] was not involved in the crime" and affidavits "that cast doubt on whether [the petitioner inmate] could have participated" in the offense, Schlup, 513 U.S. at 331; (3) a third party's consistent and

repeated statement that he committed the offense, <u>Jones v. McKee</u>, No. 08 CV 4429, 2010 WL 3522947, at \*9–10 (N.D.Ill. Sept. 2, 2010); <u>Carringer v. Stewart</u>, 132 F.3d 463, 478–79 (9th Cir. 1997) (finding that the petitioner opened the actual innocence gateway where another person testified under oath that he committed the offense and separately boasted to other individuals that he set up the petitioner); and (4) documentary evidence indicating that the petitioner was in another country on the day of the offense and five affidavits from individuals stating that the petitioner was outside the country at the precise time of the offense, <u>see</u> <u>Garcia v. Portuondo</u>, 334 F.Supp.2d 446, 452–56 (S.D.N.Y. 2004).

Respondents advance two arguments for why Stedman fails to establish an actual innocence claim: (1) the Vogelson and Baker affidavits are not "newly discovered evidence" because this evidence was available to Stedman at the time of his trial more than twenty years ago;[4] and (2) Stedman fails to meet his burden of demonstrating that "it is more likely than not that no reasonable juror would have convicted him in the light of the

---

[4] The Court notes that a circuit split exists regarding whether "new evidence" means "newly discovered" or "newly presented." <u>Reeves v. Fayette SCI</u>, 897 F.3d 154, 161–62 (3d Cir. 2018), <u>as amended</u>, (July 25, 2018). The Eighth Circuit has held that "evidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." <u>Amrine v. Bowersox</u>, 238 F.3d 1023, 1028 (8th Cir. 2001). The Seventh Circuit and Ninth Circuit have held that federal habeas petitioners may demonstrate an actual innocence claim through "newly presented" exculpatory evidence, that is, evidence not presented to the jury at trial. <u>See</u> <u>Gomez v. Jaimet</u>, 350 F.3d 673, 679–80 (7th Cir. 2003); <u>Griffin v. Johnson</u>, 350 F.3d 956, 963 (9th Cir. 2003). Likewise, the Courts of Appeals for the First, Second, and Sixth Circuits have intimated that petitioners may establish actual innocence claims through newly presented evidence. <u>See</u> <u>Riva v. Ficco</u>, 803 F.3d 77, 84 (1st Cir. 2015); <u>Cleveland v. Bradshaw</u>, 693 F.3d 626, 633 (6th Cir. 2012); <u>Rivas v. Fischer</u>, 687 F.3d 514, 543, 546–47 (2d Cir. 2012). The Fourth Circuit has not addressed this issue. Accordingly, for the purposes of its analysis, the Court assumes that Stedman's evidence satisfies the requirement that it be "new."

new evidence." Perkins, 569 U.S. at 399 (quoting Schlup, 513 U.S. at 327). The Court agrees with Respondents' second argument. The Court first discusses the evidence produced at Stedman's 1993 trial, and then turns to the Vogelson and Baker affidavits.

### 1. Trial Evidence

Stedman's trial began on June 7, 1993, in the Circuit Court for Prince George's County. (Resp'ts' Mot. Ext. Time Ex. 6 ["June 7, 1993 Tr. Transcript"], ECF No. 18-6). During trial, the State presented several witnesses who testified about events on the night of Bristol's murder. Andrew Ormsby testified that he was in front of a convenience store located on Ager Road near Riggs Road on the evening of August 10, 1992. (Id. at 1-37). Stedman, who Ormsby described as wearing a white t-shirt and blue shorts, (id. at 1-42), and the victim, Bristol, were both inside of the store while Ormsby was outside, (id. at 1-39). Although he never went into the store, Ormsby heard something going on inside the store, and when Stedman left the store he looked angry. (Id. at 1-39–1-40). Ormsby testified that Stedman said, "he was going to go home and get his joint." (Id. at 1-40). While Ormsby denied knowing what "joint" meant, (id.), another witness, Gregory Strawbridge, a friend who was with Stedman on the night of Bristol's murder, told the police he understood the term to mean "gun." (Resp'ts' Mot. Ext. Time Ex. 5 ["June 8, 1993 Tr. Transcript"] at 2-45–46, 2-77, ECF No. 18-5). Strawbridge subsequently denied ever hearing the term when he took the stand at trial. (Id. at 2-46).

Carl Proctor testified that he was in the area on the night of the shooting when he heard gunshots. (June 7, 1993 Tr. Transcript at 1-73–1-74). He observed a white Toyota Tercel or Dodge Colt hatchback with two doors stopped in the middle of the street. (Id. at

1-75). As he looked around, Proctor saw a man laying in the field in front of him and somebody standing over the man. (Id. at 1-76). The person standing over the man had his hands pointed down at the man. (Id.). Proctor then heard "[a] couple more shots." (Id.). Proctor testified that the person standing had something in his hand that "[l]ooked like a gun," but that he "wouldn't swear to it." (Id.). The person then ran across the field and got into the front passenger side of the car that was stopped in the middle of the street and the car drove away. (Id. at 1-76–1-77). Proctor described the shooter as "a slender black guy, dark, about . . . five eleven to six feet," in his "[e]arly twenties," and wearing a "khaki color or white t-shirt." (Id. at 1-77).

Christopher Johnson testified that he knew both Bristol and Stedman, and that Johnson was with Bristol on the night of the shooting. (Id. at 1-87–1-89). He testified that when he and Bristol went into the convenience store on Ager Road, Stedman was there wearing a white t-shirt and blue shorts. (Id. at 1-89, 1-97). Bristol and Stedman got into an argument over "turf in the neighborhood." (Id. at 1-90). Johnson testified that Bristol started the argument, but Stedman did not respond, so Bristol "stepped [to Stedman], pushed him a few times and argued and fussed." (Id. at 1-91). Bristol left the store to go to a different store and continued to call Stedman out so they could fight but Stedman did not come out of the store. (Id. at 1-93).

Johnson and Bristol went to another convenience store and then walked to a bus stop. (Id. at 1-93–1-94). They waited about ten minutes for the bus and then got on the bus. (Id. at 1-94). When they got off the bus, a white four-door car pulled up and stopped in the middle of the street. (Id. at 1-94–1-96). When Johnson saw a person he thought was

Stedman get out of the car, he "immediately ran" because of the altercation in the store. (Id. at 1-95–1-97). Johnson ran to another store and, when he returned, Bristol had been shot. (Id. at 1-98–1-99).[5]

Bristol's cousin, Nally Roberts, testified that Bristol told him to meet him at the convenience store on the night of the murder. (Id. at 1-109). When he arrived, Bristol was there and Stedman was in the store on the phone. (Id. at 1-109–1-110). Roberts witnessed the argument between Bristol and Stedman, and when Stedman came out of the store, Roberts overheard him say he was "going to get [his] shit." (Id. at 1-110–1-111). Roberts told Bristol what Stedman said and advised Bristol to leave the area. (Id. at 1-113). About five minutes after Bristol got on the bus, Roberts saw a car pull in front of the convenience store before continuing down the road. (Id. at 1-118–1-119). Roberts saw Stedman in the front passenger seat of a white hatchback Honda Accord, with Stedman's cousin in the driver's seat. (Id. at 1-115–1-116). Another unidentified man was in the back seat of the car. (Id. at 1-116–1-117).

After unsuccessfully attempting to invoke his Fifth Amendment right against self-incrimination, Strawbridge testified. (June 8, 1993 Tr. Transcript at 2-21, 2-24–2-26). Strawbridge stated that on the day of the shooting, he, David Wilson, and Stedman went shopping at a local mall and then went to the grocery store to get something to eat. (Id. at

---

[5] Johnson was later recalled after the State proffered evidence that Stedman's family had tampered with his testimony (June 8, 1993 Tr. Transcript at 2-98–2-99). Additionally, trial counsel testified during state post-conviction proceedings that, "Quite honestly, I think Chris Johnson knew – I don't want to say my client was guilty, but I think he knew in his mind what he saw." (Feb. 8, 2001 Post-Conviction Hearing Tr. at 32, ECF No. 18-3).

2-27–2-28). Wilson and Stedman went into the store while Strawbridge went around the corner. (Id. at 2-29). Strawbridge heard yelling and saw Bristol and two other men in front of the store. (Id.). Strawbridge went into the grocery store and told Stedman that he was going to go home. (Id.). Stedman replied that his cousin was coming to get him and agreed to give Strawbridge a ride. (Id.).

The prosecutor confronted Strawbridge with a written statement he gave the Hyattsville City Police on August 17, 1992, which Strawbridge said the police pressured him into writing. (Id. at 2-32–2-33). In the statement, Strawbridge said, "I went to the front of the store and saw [Bristol] outside the store saying to [Stedman], 'Come on out, Bitch. Come on out.' [Stedman] just stood inside the store with his arms crossed." (Id. at 2-34). "[Stedman] said, "I'm going to kill his ass.'" (Id. at 2-35). Strawbridge further testified that a four-door white car then came to pick him and Stedman up, and Stedman got into the front passenger seat. (Id. at 2-36–2-37). He also told police that Stedman was wearing a white shirt, black shoes, and blue shorts the night of the murder. (Id. at 2-41). Strawbridge told police that he thought Stedman shot Bristol, but testified that the police told him to make that statement. (Id. at 2-77–2-78).

Another eyewitness, Sandra Cheston, testified that the shooter was wearing "dark shorts, either blue or black" and "a big white shirt" and described the vehicle the shooter emerged from as a white, four-door sedan. (Id. at 2-90–2-93)

Stedman took the stand in his own defense, (June 8, 1993 Tr. Transcript at 2-140–2-184), in a manner that was described by his own post-conviction expert as a damaging to the defense, (Mar. 22, 2002 at H-14–H-27, ECF No. 24-1). Stedman explained that he

and Bristol had problems in the past arising from a "slap boxing" incident. (June 8, 1993 Tr. Transcript at 2-142–2-143). Stedman testified that on the night of the shooting he was wearing a white t-shirt and blue shorts. (Id. at 2-170–2-171). He further testified that Bristol came up to him and asked him why he had told someone that he, Stedman, was going to beat Bristol up. (Id. at 2-144). Stedman denied knowing what Bristol was talking about. (Id.). Bristol called him out to fight, but Stedman declined and called his cousin for a ride. (Id. at 2-144–2-145). Stedman's cousin came, in a white car, and he and Wilson left while Bristol was still at the store. (Id. at 2-146). They dropped Strawbridge off, and then Stedman's cousin took Stedman to his grandmother's house. (Id.). Stedman went to a recreation center for about an hour to play ping pong. (Id. at 2-147). Stedman later took a cab to his child's mother's house in Washington, D.C., where he spent the night. (Id.). Prior to leaving for Washington, D.C., Stedman stopped by the apartment complex where he lived, and everyone there told him that they heard he killed Bristol. (Id.). When he arrived in Washington, D.C., unspecified individuals there were talking about Bristol's shooting. (Id. at 2-148). Stedman testified that he "got scared," so he took the bus to New York and got a plane ticket in another name to Jamaica. (Id.). Stedman explained that he eventually returned to the United States because he wanted to clear his name and could not live away from his son and family. (Id. at 2-149–2-150). Stedman expressly denied killing Bristol. (Id. at 2-152).

Detective Mark Roski ("Detective Roski") of the Hyattsville City Police Department testified that on the night of the shooting he went to Stedman's home as well as the homes of Stedman's grandmother and father, but could not locate Stedman. (June 7,

1993 Tr. Transcript at 1-58–1-59). Ultimately Detective Roski arrested Stedman on November 3, 1992, when he disembarked from a flight coming back from Jamaica. (Id. at 1-60).

### 2. Vogelson and Baker Affidavits

The police notes from 1992 indicate that Vogelson and Baker were listed among a number of witnesses who heard gunshots but whose accounts "[varied] as to seeing a suspect." (Pet. Ex. 6, ECF No. 1-1 at 19). The police notes also indicate that they did not interview Vogelson on scene, but that Vogelson provided a written statement. (Id.).

Before trial, Stedman's trial attorney, David Simpson, hired a private investigator, Sharon Weidenfeld, to assist with locating and interviewing witnesses. (Oct. 11, 2000 Post-Conviction Hearing Tr. at 16, 25, ECF No. 20-2; Feb. 8, 2001 Post-Conviction Hearing Tr. at 9–10, ECF No. 18-3; Pet. at 4). Simpson testified that he had been provided the police reports regarding the Bristol shooting. (Feb. 8, 2001 Post-Conviction Hearing Tr. at 7; see also Oct. 11, 2000 Post-Conviction Hearing Tr. 7, 16–17, 24–25; Pet. Ex. 6 at 19–26). The police reports specifically noted that several witnesses, including Vogelson and Baker, had varying abilities to see the shooter. (Oct. 11, 2000 Post-Conviction Hearing Tr. at 26–27; Pet. Ex. 6 at 19). Stedman and Simpson spoke about Vogelson in particular and the efforts to locate him. (Oct. 11, 2000 Post-Conviction Hearing Tr. at 27). Weidenfeld was unable to locate Vogelson. (Weidenfeld Aff. ¶¶ 3–4, ECF No. 18-2 at 39–40).[6]

---

[6] Citations to ECF No. 18-2 refer to the pagination CM/ECF assigned.

After his trial, in 1995, Stedman retained Myrtle E. Wyre, who hired a private investigator, to reinvestigate his case. (Pet. at 3; Pet. Ex. 3, ECF No. 1-1 at 8). Wyre and the private investigator were unable to locate any of the witnesses to the shooting. (Pet. at 3). In 1996, Stedman discharged Wyre and hired Robert Law to represent him. (Id.). In 1999, Law and co-counsel David Slade hired another investigator to locate witnesses. (Id.). This investigator was able to learn some facts about Vogelson, including his address and grandmother's address and phone number. (Id.; Id. Ex. 4 ECF No. 1-1 at 10).

In 2005, Stedman rehired Weidenfeld. (Pet. at 4). Weidenfeld located and acquired affidavits from Baker and Vogelson at the time. (Pet. at 4; Vogelson Aff.; Baker Aff.). Stedman contends that prior to 2005 he was not aware that Vogelson or Baker had evidence favorable to him that "exonerates [him] as the shooter of [Bristol]." (Pet. at 5). According to Stedman, it was not until 2005 that he discovered that Vogelson spoke with Detective Roski and gave the same account to Detective Roski as contained in his affidavit. (Id.).

During Stedman's first post-conviction proceedings in 2005, Weidenfeld filed an affidavit indicating that Stedman's trial attorney, Simpson, hired her in 1992–93. (Weidenfeld Aff. ¶ 2). Simpson requested that she interview Vogelson, whose name appeared on the police report contained in the discovery the State provided. (Id. ¶ 3). She made "several attempts" to interview Vogelson "by going to his house and looking for him." (Id. ¶ 4). Weidenfeld left her card, as was her "usual practice," but Vogelson never contacted her and she was not able to meet him on any of her visits to his house. (Id.).

In 2005, Stedman again contacted Weidenfeld requesting that she do additional work on his case and she agreed. (Weidenfeld Aff. ¶ 5). In 2005, she located Baker, whose

name appeared in a police report in discovery turned over prior to trial. (Id. ¶ 6). Weidenfeld interviewed Baker and he gave a recorded statement of his eyewitness account of Bristol's murder. (Id. ¶ 7). Also in 2005, "after numerous attempts to locate and interview" Vogelson, Weidenfeld finally located and interviewed him. (Id. ¶ 8). Vogelson also gave a recorded statement of his account of Bristol's murder. (Id. ¶ 9)

In his 2005 affidavit, Vogelson states that he witnessed the shooting of Bristol on August 10, 1992. (Vogelson Aff. ¶ 1). He was able to observe the individual who shot Bristol, who he describes as black, 5'5" or 5'6", with a slender build; wearing a white t-shirt and dark grayish or dark bluish shorts. (Id.). Vogelson further avers that the shooter ran toward a white car that looked like 1992 Hyundai, and then jumped in the back seat of the car which left the scene. (Id.).

The police interviewed Vogelson on the night of the shooting. (Id. ¶ 2). He gave his name, address, and signed, written statement consistent with the description of events in his affidavit. (Id.). Neither Stedman's trial attorney nor Weidenfeld contacted Vogelson prior to Stedman's trial. (Id. ¶ 3). Vogelson was not called to testify as a witness at trial and was not called to testify at any of Stedman's post-conviction hearings in 2002. (Id.).

Vogelson states that he had class with, and played football with, Stedman at North Western High School and would have recognized him if he was Bristol's shooter. (Id. ¶ 4). He states that Stedman did not shoot Bristol. (Id.). Vogelson avers that had he been interviewed or subpoenaed, he would have appeared to testify, consistent with his current statement, at trial or at the 2002 post-conviction hearing. (Id. ¶ 5).

In his 2005 affidavit, Baker avers that he witnessed Bristol's shooting on August 10, 1992. (Baker Aff. ¶ 1). Baker spoke to the police that night and gave them his name and address. (Id. ¶ 2). Like Vogelson, neither Stedman's trial attorney nor Weidenfeld contacted Baker prior to trial. (Id. ¶ 3). Baker also was not contacted in 2002 to testify in Stedman's post-conviction proceedings. (Id.). The first time Baker was interviewed about the Bristol shooting was July 2005. (Id.). Baker states that at the time of the shooting, he had known Stedman for two to three years and that they "lived in the same neighborhood" but "were not friends." (Id. ¶ 4). Nevertheless, Baker "knew who [Stedman] was and what he looked like." (Id.). In Baker's view, Stedman "was not the person that shot Mr. Bristol." (Id.). Baker asserts that had he been interviewed or subpoenaed, he would have appeared and testified consistent with the statement in his affidavit. (Id. ¶ 5).

In sum, the police interviewed both Baker and Vogelson the time of the shooting; their names, but not the substance of their interviews were provided to trial counsel as part of discovery; neither trial counsel nor Weidenfeld interviewed Baker or Vogelson prior to trial; and neither Baker nor Vogelson was subpoenaed to appear at the trial or Stedman's post-conviction proceedings. Stedman's first post-conviction counsel also did not interview Baker or Vogelson.

### 1.    Analysis

At bottom, assuming that the Vogelson and Baker affidavits are "new" evidence, Stedman nevertheless fails to establish that the affidavits are reliable or that no reasonable juror would have found him guilty beyond a reasonable doubt in light of the affidavits.

### a. Reliability of the Affidavits

Evidence in support of an actual innocence claim must portray "factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). While the Court must determine whether "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," Sharpe v. Bell, 593 F.3d 372, 377 (4th Cir. 2010) (quoting Schlup, 513 U.S. at 327–28), the Court "need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim with evidence of the requisite quality," Hill v. Johnson, 2010 WL 5476755, at *5 (E.D.Va. Dec. 30, 2010); see also Feaster v. Beshears, 56 F.Supp.2d 600, 610 (D.Md. 1999) (quoting Schlup, 513 U.S. at 316) (noting that a petitioner must first demonstrate new evidence of actual innocence).

"[A] federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown." Perkins 569 U.S. at 387. In making such an assessment, "the timing of the [petition]" is a factor bearing on the "reliability of [the] evidence" purporting to show actual innocence. Id. at 387 (quoting Schlup, 513 U.S. at 332). Rather than "treating timeliness as a threshold inquiry," "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing [of actual innocence]." Id. at 385. Considering the delay in presenting evidence as bearing on reliability "is tuned to the exception's underlying rationale of ensuring 'that federal constitutional errors do not result in the incarceration of innocent persons.'" Id. (quoting Herrera, 506 U.S. at 404).

In making such a determination, the Court may examine the timing of the affidavits and the credibility that the affiants would have on the reliability of the evidence. <u>Schlup</u>, 513 U.S. at 329; <u>Herrera</u>, 506 U.S. at 417 (finding affidavits submitted eight years after trial suspect because the petitioner failed to provide a satisfactory explanation for the delay); <u>see also</u> <u>id.</u> at 423 (O'Connor, J., concurring) (stating that affidavits alleging actual innocence collected ten years after the petitioner was convicted on "seemingly dispositive evidence" are not uncommon, and that "such affidavits are to be treated with a fair degree of skepticism"); <u>McDowell v. Lemke</u>, 737 F.3d 476, 483–84 (7th Cir. 2013) (stating that "eleventh hour" self-serving affidavits containing no indicia of reliability and which are accompanied by no reasonable explanation for the delay are inherently suspect).

In this case, despite Stedman's repeated assertions that he pursued his claims of actual innocence with "unwavering diligence," (Pet. at 2, 5), the timeline of events tells a different story. Stedman obtained the Vogelson and Baker affidavits in 2005, but he did not move to re-open his state post-conviction proceedings until 2008. Stedman does not explain why he waited for three years after obtaining the affidavits to do so. Stedman also does not explain why when the Circuit Court denied his motion in 2010, he waited until 2011 to file a state petition for actual innocence. Finally, Stedman offers no explanation for why after that petition was denied he waited several months to file the instant case. Thus, the lack of explanation for both the delay in obtaining the affidavits as well as in submitting the affidavits to the appropriate courts undercuts the reliability of the Vogelson and Baker affidavits. <u>See</u> <u>Herrera</u>, 506 U.S. at 417 (noting that affidavits supporting actual

innocence claims obtained years after a conviction are not uncommon and should be treated with "a fair degree of skepticism").

Further, Baker's affidavit lacks any specific information about Bristol's shooting and simply avers that "Mr. Stedman was not the person that shot Mr. Bristol." (Baker Aff. ¶ 4). Although Vogelson's affidavit contains some specifics—the shooter was "black," "5'5, 5'6," with a "slender build," and "wearing a white t-shirt" and "dark grayish or dark bluish shorts" and he "was running towards a white car that looked like a '92 Hyundai"—these details are similar to those to which trial witnesses testified. (Vogelson Aff. ¶ 1). Beyond these details, Vogelson provides the same conclusory statement as Baker: "Mr. Stedman was not the person that shot Mr. Bristol." (Id. ¶ 4). The police listed Vogelson and Baker with the witnesses that varied in their ability to see the suspect, and the affidavits do not explain the vantage point of each witness on the night of Bristol's murder. (Pet. Ex. 6 at 19). Finally, neither Vogelson nor Baker explain why they waited so long to provide their exculpatory statements—twelve years after Stedman had been sentenced and after Stedman had exhausted his appeals. Thus, the Court concludes that the Vogelson and Baker affidavits are unreliable.

### b. Assessment of Trial Evidence and New Evidence

The "more likely than not" standard requires a petitioner "to make a stronger showing than that needed to establish prejudice," but "imposes a lower burden of proof than the 'clear and convincing standard.'" Schlup, 513 U.S. at 327. This standard "ensures that petitioner's case is truly 'extraordinary,' while still providing petitioner a meaningful

avenue by which to avoid a manifest injustice." Id. (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)).

Stedman contends that the prosecutors did not disclose the information contained in the Vogelson and Baker affidavits to his attorney during the pretrial discovery process,[7] and if they had, the outcome of his trial "would have been different." (Pet. at 5). The Court disagrees.

Stedman's situation does not present the extraordinary case where it is more likely than not that no reasonable juror would have convicted him in light of the affidavits. The Court recognizes the weaknesses in the State's case against Stedman, including the lack of physical evidence that tied him to the murder and the witnesses' reluctance to identify him as the shooter. The State did, however, present evidence of motive: that Stedman and Bristol argued the day of the murder and that Stedman was heard to say he was going to get his "joint" and "kill his ass." In addition, Stedman himself testified that he had problems with Bristol in the past arising from a slap boxing incident. Stedman also had the opportunity to kill Bristol as evidenced by the matching independent identifications of witnesses who placed Stedman in the white, four-door car driven by Stedman's cousin, and Stedman's own testimony that he was in the area on the date and around the time of the murder. Two witnesses testified that they believed Stedman shot Bristol: Johnson, Bristol's friend, who was reluctant to identify Stedman, testified that he fled from the car because

---

[7] There is no indication in the record before the Court that Vogelson advised police that Stedman was not the shooter. Further, the police provided Vogelson's name to trial counsel as part of pretrial discovery. (Oct. 11, 2000 Post-Conviction Hearing Tr. at 26–27).

he believed it was Stedman that exited the vehicle; and Strawbridge, who was with Stedman the day of the shooting, told police he believed Stedman shot Bristol. Multiple eyewitnesses identified the shooter as wearing the same clothes that Stedman testified that he was wearing on the day of the shooting. Additionally, Stedman admitted that he fled the country after Bristol's shooting.

While the Vogelson and Baker affidavits are somewhat probative, had the information in the affidavits been presented at trial, the jury could have weighed it against the evidence offered by the State before returning its verdict. As discussed above, Vogelson and Baker simply aver that Stedman was not the shooter; they do not provide a description of their vantage points the night of the shooting. A conclusory statement that Stedman was not the shooter is not a description of the events Vogelson and Baker witnessed the night of the shooting. In addition, coming so long after Stedman's trial, the offered declarations of Stedman's innocence fall short of that which is required to demonstrate actual innocence. Weighing the staleness of the declarations and their lack of information against the evidence adduced at trial, the Court is not persuaded that any reasonable juror would not have convicted Stedman in light of this evidence.[8] See Blackmon v. Williams, 823 F.3d

---

[8] Stedman is also not entitled to an evidentiary hearing to develop his actual innocence claim. In evaluating a request for an evidentiary hearing, a district court "should consider the particular facts raised by the petitioner in support of his actual innocence claim." Teleguz, 689 F.3d at 331. Stedman has not raised any facts that would entitle him to further exploration of his actual innocence claim. In the absence of clear and convincing evidence, it would be improper for the Court to second-guess the state court's findings. Cf. Teleguz, 689 F.3d at 331 ("[T]he district court is permitted under Schlup to make some credibility assessments when . . . a state court has not evaluated the reliability of a petitioner's newly presented evidence that may indeed call into question the credibility of the witnesses presented at trial." (internal quotation marks and alterations omitted)).

1088, 1100–02 (7th Cir. 2016) (rejecting actual innocence claim where, eight years after trial, witnesses claimed that they saw shooting and that the petitioner was not the shooter because trial witnesses testified that the petitioner was the shooter).

In sum, upon a review of all of the evidence, Stedman fails to show that a reasonable juror would be prevented from finding him guilty beyond a reasonable doubt. Stedman, therefore, has not satisfied the threshold requirements necessary for the Court to consider the merits of his time-barred Petition under the actual innocence exception. Accordingly, the Court will dismiss the Petition.

## C.   **Certificate of Appealability**

When a district court dismisses a habeas petition solely on procedural grounds, a certificate of appealability ("COA") will not issue unless the petitioner can demonstrate both: (1) "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right"; and (2) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Rose v. Lee, 252 F.3d 676, 684 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). A litigant seeking a COA must demonstrate that a procedural ruling barring relief is itself debatable among jurists of reason; otherwise, the appeal would not "deserve encouragement to proceed further." Buck v. Davis, 137 S.Ct. 759, 777 (2017) (quoting Slack, 529 U.S. at 484). Denial of a COA does not preclude a petitioner from seeking permission to file a successive

---

Moreover, even assuming the credibility of the affidavits presented, for the reasons discussed above, it is not more likely than not that no reasonable juror would have convicted Stedman.

petition or from pursuing his claims upon receiving such permission. Here, the Court will dismiss Stedman's Petition on procedural grounds. Based upon the Court's analysis above, the Court concludes that reasonable jurists would not debate whether the Court erred in its procedural ruling. Accordingly, the Court will not issue a COA.

### III. CONCLUSION

For the foregoing reasons, the Court will dismiss Stedman's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 1). A separate Order follows.


Entered this 23rd day of April, 2019.

/s/
_____
George L. Russell, III
United States District Judge